COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-023-CR

 

 

JOEMAR
JACKSON                                                                           APPELLANT

 

                                                             V.

 

THE
STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

          FROM CRIMINAL DISTRICT
COURT NO. 3 OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

                                                       ------------

I.  INTRODUCTION








Appellant Joemar Jackson appeals his
conviction for capital murder.  In six
issues, Jackson argues that the trial court erred by denying his Batson
challenge, by overruling his objections to the State=s closing argument, by refusing to
grant a mistrial based on inadmissible hearsay, by overruling his objection to
later hearsay, and by not including an accomplice-witness instruction in the
jury charge.  We will affirm.

II.  FACTUAL AND PROCEDURAL BACKGROUND

 Eric Witt was a drug dealer in the Como area
of Fort Worth.  He was at his home one
evening with his friend Kretearria Porter when Jackson came over, purchased
some drugs from Witt, and left.  Another
man showed up to buy drugs after Jackson left. 
As the man was leaving Witt=s house, two men carrying guns forced their way inside.  The first man carried a black gun, and the
second man carried a silver gun; both men had bandanas covering their faces
below their eyes.  The first man shot
Witt in the hand as he was trying to shut the door on the men, and Witt fell to
the ground.

One of the men ordered Porter to lay
on the floor.  The man with the silver
gun asked Witt, AE, where=s the dope at?@ 
Witt told him it was in a cracker box in the kitchen.  One of the men searched Witt=s pockets as he lay on the
floor.  The man with the black gun stood
over Witt and shot Witt in the back of the head as they were leaving.  The two men left, and the man who had just
purchased drugs fled out the front door after them.  Witt died from the gunshot wound to his head.








Police eventually arrested James
Phillips, Kenneth Francis, Nathaniel Baldwin, and Jackson in connection with
Witt=s murder.  Francis admitted to participating in the
robbery, and he told detectives that Jackson was the robber who shot Witt.  Phillips also admitted to participating in
the robbery and told detectives that Jackson was the shooter. 

At Jackson=s trial, Francis testified that
Phillips, Baldwin, and Jackson had planned to rob Witt and that Francis=s role was to go to Witt=s house to buy drugs so that he could
determine how many people were inside Witt=s house.  By the time
Francis got to Witt=s house, Phillips and Jackson were
already inside; Francis saw Witt and Porter laying on the floor, Phillips
standing over Witt with a chrome gun, and Jackson in the kitchen with a black
gun. Witt was pleading for them not to kill him and was saying, AIt=s in the box.  It=s in the box.@ 
Francis ran back to his car and heard a gunshot.  Sometime after the robbery, Francis saw
Jackson and asked him why he had shot Witt. 
Jackson told him, AWhen I shot E, [Phillips] threw up.@ 
Francis testified that he had agreed to testify for the State in
exchange for an eight-year sentence for conspiracy to commit robbery.  








Phillips testified that on the day of
Witt=s murder, Baldwin had showed up at
his house and had told him, ALet=s go get this money.@  Phillips did not know
exactly what he was talking about, but he knew that Baldwin was asking if he
wanted to go rob someone.  Phillips got
in the car with Baldwin, Jackson, and Francis and learned that they planned to
rob Witt.  Phillips testified that
Baldwin=s role in the robbery was A[j]ust getting the door open.@ 
According to Phillips, Baldwin approached Witt=s house first under the guise of
purchasing drugs, and while Baldwin was inside, Jackson Abust[ed] up in there.@ 
Phillips said that he and Francis were still outside when they heard a
gunshot.  Phillips went inside and saw
that Witt had been shot in the hand. 
Phillips started grabbing money and drugs.  He was carrying a chrome-plated
revolver.  He testified that he ran to
his mother=s house after the robbery and threw
up at her house from running so hard. 
Phillips explained that he had agreed to testify for the State in
exchange for a twenty-five-year sentence for capital murder.

LaTonia Clark testified that Francis
was her boyfriend when Witt was murdered. 
On the night of Witt=s murder, Clark heard Phillips tell
Francis that he wanted to rob Witt because he and Jackson had seen Aa lot of money or drugs@ at Witt=s house.  Later that night, Francis was taking a bath
when he told Clark about the robbery.  He
was crying, and he told Clark that Jackson had shot Witt in the back of the
head and that Phillips had thrown up in Witt=s house.

Lee Hall testified that he lives in
Como and knows Jackson, Phillips, Francis, and Baldwin.  After Witt=s murder, Hall overheard a conversation between Jackson and a
man who lives next door to Hall=s grandmother. Jackson was talking
about Phillips and said, AI hope the boy can hold water.  I ain=t never did no crime. 
I ain=t never did no dirt with him.  I just hope he don=t snitch on me.@ 
Hall explained that when Jackson said he Aain=t never did no dirt with [Phillips],@ Jackson meant that he had never
committed a crime with Phillips.  Hall
also overheard Jackson tell the man, AMan, I should have murked [Phillips],@ which is a street term for murder.








Donald Coleman testified that he had
a sexual relationship with Phillips at the time of Witt=s murder and that Phillips had told
him that Phillips, Jackson, and Francis robbed Athe dope man.@ 
Coleman testified that Phillips had told him that Jackson shot Witt
during the robbery. 

Marquies Amos testified that he knows
Phillips, Francis, Baldwin, and Jackson and that he had known Witt.  Amos said that Phillips had told him that
Jackson shot Witt during the robbery. 
Amos also testified that Jackson confessed to him that he had shot Witt
because, during the robbery, Phillips was calling Jackson by his name in front
of Witt and because Witt was telling Jackson, AI know where y=all live.@ 
Amos agreed to testify for the State in exchange for a plea agreement
with his brother regarding unrelated charges. 


The jury convicted Jackson of capital
murder.  Acknowledging that the State had
waived the death penalty, the trial court sentenced Jackson to life in prison.

III.  BATSON CHALLENGE

In his first issue, Jackson argues
that the trial court erred by overruling his Batson challenge regarding
the State=s use of a peremptory strike on
veniremember 3, who was African-American. 
Jackson asserts that the State=s proffered race-neutral reason for striking veniremember 3
was a pretext for racial discrimination. 
Jackson is African-American.

A.  Law on Batson Challenges








The Equal Protection Clause of the
Fourteenth Amendment to the United States Constitution prohibits race‑based
jury selection.  U.S. Const. amend. XIV; Batson
v. Kentucky, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986); Jasper v.
State, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001); see Tex. Code
Crim. Proc. Ann. art. 35.261(a) (Vernon 2006). 
In the face of perceived purposeful discrimination, the defendant may
request a Batson hearing to address the challenge.  See Tex. Code Crim. Proc. Ann. art.
35.261(a).

Trial courts follow a three‑step
process when resolving Batson challenges.  Snyder v. Louisiana, 552 U.S. 472,
476, 128 S. Ct. 1203, 1207 (2008); Young v. State, 283 S.W.3d 854, 866
(Tex. Crim. App.), cert. denied, 130 S. Ct. 1015 (2009).  First, the defense must make a prima facie
case of racial discrimination.  Snyder,
552 U.S. at 476, 128 S. Ct. at 1207; Watkins v. State, 245 S.W.3d 444,
447 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 92 (2008).  Second, if the prima facie showing has been
made, the burden of production shifts to the State to articulate a race‑neutral
reason for its strike. Snyder, 552 U.S. at 476, 128 S. Ct. at 1207; Watkins,
245 S.W.3d at 447. Third, if the State tenders a race‑neutral
explanation, the trial court must then decide whether the defendant has proved
purposeful racial discrimination. Snyder, 552 U.S. at 476, 128 S. Ct. at
1207; Watkins, 245 S.W.3d at 447.








The step‑two explanation need
only be race neutral on its face.  Purkett
v. Elem, 514 U.S. 765, 767B68, 115 S. Ct. 1769, 1771 (1995); Watkins,
245 S.W.3d at 447.  The ultimate
plausibility of that race‑neutral explanation is to be considered as part
of the third step of the analysis, in which the trial court determines whether
the defendant has satisfied his burden of persuasion to prove that the strike
was indeed the product of the State=s purposeful discrimination.  Purkett, 514 U.S. at 768, 115 S. Ct. at
1771; Watkins, 245 S.W.3d at 447. 
Throughout the challenge, the burden of persuasion remains with the
defendant.  Purkett, 514 U.S. at
768, 115 S. Ct. at 1771; Ford v. State, 1 S.W.3d 691, 693 (Tex. Crim.
App. 1999).  The defendant must prove by
a preponderance of the evidence that the allegations of purposeful
discrimination were true in fact and that the prosecutor=s reasons were merely a sham or
pretext.  Watkins, 245 S.W.3d at
451B52.

B.  Standard of Review

On appeal, a trial court=s ruling on the issue of
discriminatory intent must be sustained unless it is clearly erroneous.  Snyder, 552 U.S. at 477, 128 S. Ct. at
1207; Watkins, 245 S.W.3d at 448. 
Appellate courts must give great deference to credibility and demeanor
determinations made by the trial court in connection with a Batson inquiry.  Snyder, 552 U.S. at 477, 128 S. Ct. at
1208.  The court of criminal appeals has
explained our review of a Batson ruling as follows,

In
assaying the record for clear error, vel non, the reviewing court should
consider the entire record of voir dire; it need not limit itself to arguments
or considerations that the parties specifically called to the trial court=s
attention so long as those arguments or considerations are manifestly grounded
in the appellate record.  But a reviewing
court should examine a trial court=s conclusion that a facially race‑neutral
explanation for a peremptory challenge is genuine, rather than a pretext, with
great deference, reversing only when that conclusion is, in view of the record
as a whole, clearly erroneous.

 

Watkins, 245 S.W.3d at 448 (citations omitted).








When determining whether a race‑neutral
explanation was a pretext for purposeful discrimination, we examine whether
comparative evidence demonstrates disparate treatment of minority
veniremembers.  See Miller‑El
v. Dretke, 545 U.S. 231, 241, 125 S. Ct. 2317, 2325 (2005).  If a prosecutor=s race‑neutral reason for striking a minority
veniremember applies equally to an otherwise similar non‑minority
veniremember whom the prosecutor does not challenge, this may be evidence that
the race‑neutral reason is a pretext for purposeful discrimination.  See id. 

We cannot, however, automatically
impute disparate treatment in every case in which a reason for striking a
minority veniremember also technically applies to a non‑minority
veniremember whom the prosecutor found acceptable.  See Cantu v. State, 842 S.W.2d 667,
689 (Tex. Crim. App. 1992), cert. denied, 509 U.S. 926 (1993).  The decision to strike a particular potential
juror is not susceptible to rigid qualification.  Id. 
We must also look to the entire record to determine if, despite a
similarity, there are any significant differences between the characteristics
and responses of the veniremembers that would, under the facts of the case,
justify the prosecutor treating them differently as potential members of the
jury.  See Miller‑El, 545
U.S. at 247, 125 S. Ct. at 2329.








In Miller‑El, the
Supreme Court Aconsidered the combined impact of a
number of factors in concluding that, by clear and convincing evidence, the
prosecutors exercised two peremptory challenges on a racially discriminatory
basis, notwithstanding the race‑neutral explanations they offered at the Batson
hearing.@ 
Watkins, 245 S.W.3d at 448 (citing Miller‑El, 545
U.S. at 266, 125 S. Ct. at 2317).  Those
factors included (1) that the State had struck a higher percentage of African‑Americans
than non‑African‑Americans, (2) that the State=s reasons for striking African‑American
jurors appeared to apply equally to non‑African‑American jurors
whom the State did not strike, (3) that the State had used jury shuffles in a
manner that supported an inference of racial discrimination, (4) that the State
had questioned African‑American and non‑African‑American
jurors differently and in a way designed to obtain answers justifying strikes
of African‑American jurors, and (5) that the county in which Miller-El
was prosecuted had a formal policy of excluding minority jurors from
service.  Miller‑El, 545
U.S. at 240B64, 125 S. Ct. at 2325B39; see Watkins, 245 S.W.3d at
448B49.

C.  Batson Hearing 








After the State exercised its strikes
to the venire panel, Jackson=s trial counsel raised a Batson
challenge, arguing that the State had stricken the remaining three African‑Americans
from the venire panel.  Although the
record does not demonstrate the race of the veniremembers, we glean from the
parties= arguments in the record and on
appeal that five veniremembers were African-American; one was stricken for
cause by agreement, one was stricken by Jackson because he was a Fort Worth
police officer, and the remaining threeCveniremembers 3, 4, and 14Cwere stricken by the State.[2]  The trial court asked for the State=s reasons for striking veniremembers
3, 4, and 14. 

The State explained that it struck
veniremember 3 because Ashe did not like the law of parties
with regard to the non-shooter in a capital murder case, and that=s very possibly an issue in this
case.@ 
The State explained that it struck veniremember 4 because she had
written on her juror questionnaire that her brother is a drug dealer and
because, during voir dire, she had agreed that the justice system is Asometimes@ flawed and unfair and that she has
felt isolated in the past.[3]  Finally, the State said it struck
veniremember 14 because he had failed to disclose his prior arrest for credit
card abuse and because he had stated in his jury questionnaire that he had
several children but also that he was single.

The trial court found that the State
had provided race-neutral reasons for striking veniremembers 3, 4, and 14, and
it denied Jackson=s Batson challenge.








On appeal, Jackson challenges only
the trial court=s denial of his Batson
challenge regarding veniremember 3, claiming that the State did not strike
another veniremember who was not African-American and who also expressed a
similar opinion about the law of parties. 
Jackson does not complain of the State=s peremptory strikes of veniremembers 4 and 14 other than to
assert that those strikes show that the State exercised peremptory strikes
disproportionally against African-American veniremembers.[4]


D.  Disproportionate Strikes Analysis

We initially note that the State used
a disproportionate number of its peremptory strikes to exclude three of the
four remaining African-American veniremembers the jury.  Of the thirty-two veniremembers within the
strike zone, four, or 12.5%, were African-Americans.  The State used three, or 30%, of its ten
peremptory challenges to strike 75% of the African-Americans on the venire
panel.  See Tex. Code Crim. Proc.
Ann. art. 35.15(b) (providing for ten peremptory challenges in non-death
penalty capital cases).  Thus, the State
used a statistically-disproportionate number of strikes on African-American
veniremembers.  See Watkins, 245
S.W.3d at 451 (noting that use of 55% of peremptory strikes to exclude 88% of
black veniremembers was clearly disproportionate); Leadon v. State, Nos.
01-08-00839-CR, 01-08-00840-CR, 2010 WL 143467, at *11 (Tex. App.CHouston [1st Dist.] Jan. 14, 2010, no
pet. h.) (holding State=s use of 36.36% of strikes on 80% of
black veniremembers was statistically disproportionate). 








The disproportionality in the use of
strikes may Asupport the appellant=s ultimate burden of persuasion that
the State=s proffered race‑neutral
explanations are a sham.@ 
Watkins, 245 S.W.3d at 452. 
But, as the United States Supreme Court in Miller‑El noted,
a comparative analysis is Amore powerful@ than Abare statistics,@ and thus, we consider the State=s proffered reason for striking
veniremember 3.  See Miller‑El,
545 U.S. at 241, 125 S. Ct. at 2325.

E.  Comparative Juror Analysis of Veniremember 3

During voir dire, as the State was
questioning the venire panel about the law of parties, the following exchange
took place between the State and veniremember 3:

[State]: Okay.  You think it would be unfair to charge Bill
with capital murder if I=m the shooter at the bank, right?

 

[Veniremember 3]:
Yes.

 

[State]: And just
like I asked Mr. Hess the same question, would you have trouble following that
part of the law if you=re on the jury?

 

[Veniremember 3]:
No, I don=t have no trouble following.

 

[State]: But you
disagree with it?

 

[Veniremember 3]:
Yeah, I disagree with it, but I ain=t heard the case.

 

[State]: Okay.  Well, sure you haven=t heard
the facts, and I=m just talking about the hypothetical I told you
about, okay?

 

[Veniremember 3]:
Uh-huh.

 

[State]: And that
is the law.  Someone who=s not
the shooter in a capital murder, they can certainly be charged and found
guilty, under the law, of capital murder, okay? 


So
you=reCbut you=re saying . . . you disagree with that law, right?      

 

[Veniremember 3]:
Yeah, I do.








[State]: So you
would have trouble following it if you were on the jury, right?

 

[Veniremember 3]:
Yeah, I guess I would.

 

[State]: Well, let
me ask youCI=ve got to pin you downCwould you or would you not?

 

[Veniremember 3]: I
would.

 

Jackson argues that the State treated
veniremember 3 differently than a non-African-American on the panel,
veniremember 21, because she also indicated that she could not agree with the
law of parties but was ultimately seated on the jury.  Jackson argues that the State Atalked [veniremember 3] into saying
she would have trouble@ following the law but Ahad no trouble@ accepting veniremember 21's
assurance that she could follow the law. 
But unlike veniremember 3, veniremember 21 never indicated that she did
not agree with the law of parties.[5]  Thus, the State=s reason for striking veniremember 3 did not apply to
veniremember 21, and we cannot say that the State=s persistent questioning of veniremember 3Cafter she had stated that she
disagreed with the law of partiesCwas designed to evoke a certain response not elicited from
veniremember 21.  See Watkins, 245
S.W.3d at 449, 453B54 (citing Miller-El, 545 U.S.
at 255B63, 125 S. Ct. at 2317).








Moreover, the State=s explanation for striking
veniremember 3 went unchallenged during the Batson hearing.  Once the State proffered its race-neutral
reason for striking veniremember 3, Jackson bore the burden to convince the
trial court that the State=s reason was not race-neutral.  See Ford, 1 S.W.3d at 693; see also
Johnson v. State, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002) (A[A] party=s failure to offer any real rebuttal
to a proffered race neutral explanation can be fatal to his claim.@). 
Jackson did not cross-examine the State about the strike or offer any
rebuttal or impeachment evidence tending to show that the State=s reason was pretextual.[6]

For these reasons, we cannot say that
the State=s reason for striking veniremember 3
applied equally to veniremember 21 or was pretextual.  See Watkins, 245 S.W.3d at 453B54; Leadon, 2010 WL 143467, at
*14B15.

F.  Remaining Strikes on African-Americans








We will also examine the State=s reasons for striking veniremembers
4 and 14 to determine whether those reasons provide evidence of the State=s discriminatory intent.  See Watkins, 245 S.W.3d at 448B49 (citing Miller-El, 545 U.S.
at 241B52, 125 S. Ct. at 2317).  The State said that it had struck
veniremember 4 because her brother is a drug dealer, and her jury questionnaire
shows that she in fact indicated that her brother had been arrested for selling
drugs.  Having a family member who has
been arrested or convicted is a race-neutral reason for striking a
veniremember, and consequently, the State provided a race-neutral reason for
striking veniremember 4.  See Simpson
v. State, 119 S.W.3d 262, 267B68 (Tex. Crim. App. 2003), cert. denied, 542 U.S. 905
(2004).

Jackson argues that the State did not
strike other veniremembers who had family or close friends with prior
convictions for driving while intoxicated, but drugs and dealing drugs were at
issue in this case, not driving while intoxicated, and the State noted in its
reasoning that Jackson=s case involved many drug
dealers.  See Beasley v. State,
838 S.W.2d 695, 700 (Tex. App.CDallas 1992, pet. ref=d) (holding prosecutor=s reasons for striking potential
jurors who had family members involved with drugs was race-neutral where
appellant=s case was drug-related), cert.
denied, 114 S. Ct. 451 (1993).  The
State also reasoned that it struck veniremember 4 because she believed that the
justice system is flawed; specifically, veniremember 4 commented, A[P]eople have done some things and
gotten off.@ 
Jackson argues on appeal that veniremember 4's statement was actually a
bias in favor of the State, but Athe State may legitimately strike prospective jurors who
appear to be unfavorable to the defense in ways that call into question their
impartiality.@ 
Johnson, 68 S.W.3d at 650. 
Thus, the trial court could have reasonably found that the State did not
have a discriminatory intent when it struck veniremember 4.  See Snyder, 552 U.S. at 477, 128 S. Ct.
at 1207; Watkins, 245 S.W.3d at 448.








Regarding veniremember 14, Jackson
admits that veniremember 14=s failure to disclose his prior
criminal history Amay well be a race neutral reason for
striking him@ but argues that the State=s second reasonCthat veniremember 14 has children but
is singleCis not an appropriate reason to
strike him.  Regardless of the State=s second reason, failure to disclose
information during voir dire and personal involvement with the criminal justice
system are race-neutral reasons to challenge a potential juror.  See Perry v. State, 770 S.W.2d 950,
952B53 (Tex. App.CFort Worth 1989, no pet.); see
also Holman v. State, 772 S.W.2d 530, 533 (Tex. App.CBeaumont 1989, no pet.) (dismissing
appellant=s argument regarding one of State=s reasons to strike potential jurors
because failure to reveal criminal histories was State=s Amain or central reason@ for exercising strikes). 
Thus, the trial court could have reasonably found that the State did not
have a discriminatory intent when it struck veniremember 14.  See Snyder, 552 U.S. at 477, 128 S.
Ct. at 1207; Watkins, 245 S.W.3d at 448.

G.  Trial Court Not Clearly Erroneous








Reviewing the record as a whole and
applying, as we must, great deference to the trial court=s ruling, we cannot say that the
trial court was clearly erroneous in overruling Jackson=s Batson challenge.  See Watkins, 245 S.W.3d at 448.  Although the statistical analysis
demonstrates that the State used a disproportionate number of peremptory
strikes on African-Americans, our comparative analysis of veniremember 3
demonstrates that the State=s reason for striking her was not
pretexual, and our analysis of the State=s remaining strikes on African-American veniremembers does
not demonstrate discriminatory intent.  See
id. at 448, 453B54. 
Accordingly, we overrule Jackson=s first issue.

IV.
JURY ARGUMENT

In his second and third issues,
Jackson argues that the State twice commented on his failure to testify during
its closing argument at the guilt-innocence stage of trial and that the trial
court erred by overruling both of his objections to the comments.  Jackson claims that this error violated his
state and federal constitutional rights against self‑incrimination and
article 38.08 of the code of criminal procedure.  See U.S. Const. amend V; Tex. Const.
art. I, ' 10; Tex. Code Crim. Proc. Ann. art.
38.08 (Vernon 2005).

A.  The Complained-Of Comments

During its closing arguments, the
State argued that Jackson=s alibi witnesses had lied on the
witness stand.  The State then stated,

And
[Jackson=s alibi witnesses] testified that [Jackson] was with
them after [six] o=clock all night long. 
That=s what the testimony was.

 

But
the defendant didn=t know that we knew he went back to the scene, so he
had to shift gears a little bit.  And now
all of a sudden, he went back to the scene. 
Yes, he admits he was there.  AI was
there, but if I was there@C 

 








Jackson objected that this was an improper comment on his
failure to testify, to which the State replied, ADefense counsel, Your Honor, is who I=m referring to.@ 
The trial court overruled the objection. 
The State continued, AThis is what it comes down to.  You heard the testimony on Friday.  You know they were lying, okay?  And if he=s going to get them to come here and lie to you, it=s because he is guilty of the
offense.@ 

Later in its closing argument, the
State argued,

And
their defense theory about Como turning [Jackson] in was shot out of the water
on day two.  And now Friday afternoon to
Monday morning, the alibi witnesses that we called up here were shot out of the
water.  That is not true.

 

If
he was going to lie to you about that, then he=s guilty of capital murder.

 

Jackson again objected that this was a comment on his failure
to testify, and the trial court overruled his objection. 

B.
Law on Comment on Failure to Testify

A comment on an accused=s failure to testify violates the
accused=s state and federal constitutional
privileges against self-incrimination.  Moore
v. State, 849 S.W.2d 350, 351 (Tex. Crim. App. 1993); Smith v. State,
65 S.W.3d 332, 339 (Tex. App.CWaco 2001, no pet.).  In addition, the code of criminal procedure provides
that a defendant=s failure to testify on his own
behalf may not be held against him and that counsel may not allude to the
defendant=s failure to testify.  Tex. Code Crim. Proc. Ann. art. 38.08.








To determine whether a comment
violates a defendant=s right against self‑incrimination
or article 38.08, we must decide whether the language used was manifestly
intended or was of such a character that the jury naturally and necessarily
would have considered it to be a comment on the defendant=s failure to testify.  See Bustamante v. State, 48 S.W.3d 761,
765 (Tex. Crim. App. 2001); Fuentes v. State, 991 S.W.2d 267, 275 (Tex.
Crim. App.), cert. denied, 528 U.S. 1026 (1999).  The offending language must be viewed from
the jury=s standpoint, and the implication
that the comment referred to the accused=s failure to testify must be clear. Bustamante, 48
S.W.3d at 765; Swallow v. State, 829 S.W.2d 223, 225 (Tex. Crim. App.
1992).  A mere indirect or implied
allusion to the defendant=s failure to testify does not violate
the accused=s right to remain silent.  Wead v. State, 129 S.W.3d 126, 130
(Tex. Crim. App. 2004); Patrick v. State, 906 S.W.2d 481, 490B91 (Tex. Crim. App. 1995), cert.
denied, 517 U.S. 1106 (1996).  A
statement referencing evidence that can come only from the defendant is,
however, a direct comment on the defendant=s failure to testify. 
Goff v. State, 931 S.W.2d 537, 548 (Tex. Crim. App. 1996), cert.
denied, 520 U.S. 1171 (1997); Madden v. State, 799 S.W.2d 683, 700
(Tex. Crim. App. 1990), cert. denied, 499 U.S. 954 (1991).

C.  State Did Not Comment on Jackson=s Failure to Testify








In the instant case, a review of
Jackson=s defensive theory and closing
argument provides some insight into the complained-of comments made by the
State in its closing argument.  At trial,
Jackson called Brandi Hawkins and Andre Hawkins to testify on his behalf.  Brandi is the mother of Jackson=s girlfriend, and Andre is the
brother of Jackson=s girlfriend.  Both testified that Jackson was at their
house the entire evening of Witt=s murder and that Jackson had slept there that night.  On cross-examination, Brandi admitted that
Jackson had sent her a handwritten affidavit to sign, stating that Jackson was
at her house on the night of Witt=s murder.  In rebuttal,
the State called two witnesses to testify that they had seen Jackson in the
crowd of bystanders at Witt=s house after Witt=s murder, contradicting Brandi=s and Andre=s testimony.  During defense counsel=s closing argument, he addressed the
State=s rebuttal and said that Brandi
Hawkins=s testimony was discredited.  He argued, 

But
I=m not going to stand in front of you and argue that
Joemar Jackson didn=t go to [Witt=s] house.  I
believe he did. 

 

But
if he went to the house, his interest in this is no different than the interest
of everybody else at the house about what happened. 

 








When the State commented later in its
closing argument that Jackson Aadmits he was there [at Witt=s house after the murder].  >I was there, but if I was there,=@ the State was clearly addressing
defense counsel=s closing argument, not any failure
to testify on Jackson=s part.[7]  The State=s comment was also addressing Jackson=s defensive theory and the
impeachment of his alibi witnesses.  
This same reasoning applies to the second complained-of argumentCthat Jackson had lied about his alibi
defense.  The State was summarizing the
evidence and addressing testimony from Jackson=s alibi witnesses and the fact that Jackson had written
affidavits for them to sign, stating that he was with them on the night of Witt=s murder.  See Felder v. State, 848 S.W.2d 85, 94B95 (Tex. Crim. App. 1992) (noting
that proper jury argument includes summations of evidence, reasonable
deductions from evidence, and answers to argument of opposing counsel), cert.
denied, 510 U.S. 829 (1993).








Viewing the State=s comments from the jury=s standpoint, we hold that the
complained-of comments did not naturally and necessarily refer to Jackson=s failure to testify; rather, they
were proper comments on Jackson=s defensive theory and testimony from
his alibi witnesses and were answers to defense counsel=s arguments.  See Bustamante, 48 S.W.3d at 765;
Smith, 65 S.W.3d at 339 (holding that State=s comments were critiques of the amount of evidence defendant
put forth on his defensive theory, not comments on failure to testify); see
also McKay v. State, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985) (concluding
prosecutor=s statement that Athere is no evidence to that effect@ and Athere is no evidence of any phantom [killer]@ was not improper reference to
defendant=s failure to testify but was invited
by counsel=s argument that someone else had
committed the murder), cert. denied, 479 U.S. 871 (1986); Edmond v.
State, 566 S.W.2d 609, 611 (Tex. Crim. App. [Panel Op.] 1978) (construing
prosecutor=s closing argument as proper comment
on appellant=s defensive theory).  The complained-of comments were not
manifestly intended or of such a character that the jury naturally and
necessarily would have considered them to be comments on Jackson=s failure to testify.  See Bustamante, 48 S.W.3d at 765; Fuentes,
991 S.W.2d at 275.

D.  Alternatively, Any Error Was Harmless

Alternatively, even assuming the
State=s arguments were comments on Jackson=s failure to testify, we conclude any
error in the trial court=s overruling Jackson=s objections was harmless.  See Tex. R. App. P. 44.2(a); see
Wimbrey v. State, 106 S.W.3d 190, 192 (Tex. App.CFort Worth 2003, pet. ref=d). 
Under Texas Rule of Appellate Procedure 44.2(a), upon determining
constitutional error exists, we should reverse unless we determine beyond a
reasonable doubt that the error did not contribute to the defendant=s conviction or punishment.  Tex. R. App. P. 44.2(a).  Our primary inquiry is what effect the error
had, or reasonably may have had, on the jury=s decision.  Wimbrey,
106 S.W.3d at 193.  AWe consider the source and nature of
the error, the extent that it was emphasized by the State, its probable
collateral implications, the weight a juror would probably place on the error,
and whether declaring it harmless would likely encourage the State to repeat it
with impunity.@ 
Harris v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).








As we explained above, a review of
the State=s entire argument, Jackson=s closing argument, and Jackson=s defensive theories reveals that the
State was referring to testimony elicited from Jackson=s alibi witnesses and defense counsel=s closing argument.  Our neutral, impartial review of the record
further demonstrates that the comment was a small part of the State=s argument and was not emphasized or
mentioned again and that the jury likely did not attribute much, if any, weight
to the error.  See id.  Although the trial court overruled Jackson=s objections, the court read its
charge to the jury prior to closing arguments. 
The charge included an instruction not to consider Jackson=s failure to testify, and the jury is
presumed to follow this instruction.  See
Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).

After carefully reviewing the record
and performing the harm analysis required under rule 44.2(a), we alternatively
hold that if the trial court erred by overruling Jackson=s objection to the State=s comments at issue, then beyond a
reasonable doubt, such error did not contribute to Jackson=s conviction or punishment.  See Tex. R. App. P. 44.2(a).  We overrule Jackson=s second and third issues. 

V.  HEARSAY STATEMENTS

In his fourth and fifth issues,
Jackson complains of hearsay statements made by Clark at trial.  We will address each of his complaints
separately below.

A.  Clark=s Testimony








Clark testified that, on the night of
Witt=s murder, she and Francis were in a
car together, that she could tell something was wrong with him, and that she
had asked Francis what had happened.  The
State then asked Clark, AWhat did he tell you?@ 
Defense counsel raised a hearsay objection, and after a discussion off
the record, defense counsel withdrew his objection.  Clark then testified, AHe said, >I didn=t do it. [Jackson] did it.=@  Outside the jury=s presence, defense counsel explained
that he had withdrawn the objection because the State had told him that Clark=s answer would be that Francis did
not tell her anything.  The State agreed
to withdraw the question.  When the jury
returned, the trial court instructed it to disregard the State=s last question and Clark=s answer.  The trial court denied Jackson=s request for a mistrial.

The State then asked Clark about a
conversation she had with Francis while he was taking a bath the night of Witt=s murder.  She testified, over Jackson=s running hearsay objection, that
Francis had told her that after he, Phillips, Baldwin, and Jackson robbed Witt,
Jackson shot Witt in the back of the head. 
Clark explained that Francis was crying A[a] lot@ while telling her about the robbery.

B.  Motion for Mistrial

In his fourth issue, Jackson argues
that the trial court erred by refusing to grant a mistrial after Clark
testified that Francis Asaid, >I didn=t do it. [Jackson] did it.=@

We review whether the trial court
erred in denying a motion for mistrial under an abuse of discretion
standard.  Ladd v. State, 3 S.W.3d
547, 567 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1070
(2000).  A trial court does not abuse its
discretion when its decision is within the zone of reasonable
disagreement.  Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh=g). 
Absent an abuse of discretion, we do not reverse a trial court=s denial of a mistrial.  Ladd, 3 S.W.3d at 567.








Granting a mistrial is an extreme
remedy for curing prejudice that occurs during a trial.  Ocon v. State, 284 S.W.3d 880, 884 (Tex.
Crim. App. 2009).  A mistrial is required
only when the improper evidence or testimony is Aclearly calculated to inflame the minds of the jury and is of
such a character as to suggest the impossibility of withdrawing the impression
produced on the minds of the jury.@  Hinojosa v. State,
4 S.W.3d 240, 253 (Tex. Crim. App. 1999). 
A trial court should grant a mistrial only when it is apparent that an
objectionable event at trial is so emotionally inflammatory that curative
instructions are not likely to prevent the jury from being unfairly prejudiced
against the defendant.  Bauder v.
State, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996), overruled on other
grounds by Ex parte Lewis, 219 S.W.3d 335 (Tex. Crim. App. 2007).  Ordinarily, a prompt instruction to disregard
will cure any prejudicial effect associated with improper testimony.  Ovalle v. State, 13 S.W.3d 774, 783
(Tex. Crim. App. 2000).  A reviewing
court should presume the jury followed the trial court=s instructions to disregard improper
testimony.  Colburn, 966 S.W.2d at
520.








In this case, by the time that Clark
testified about what Francis had said in the car, the jury had already heard
Francis testify that Jackson was the shooter and that Francis had told Clark
what had happened, as well as Hall=s testimony that Jackson had admitted to shooting Witt.  Thus, the harm from Clark=s testimony was attenuated by the
fact that the jury had already twice heard essentially the same evidence.  See Anderson v. State, 717 S.W.2d 622, 628
(Tex. Crim. App. 1986) (AInadmissible evidence can be rendered
harmless if other evidence at trial . . . proves the same fact that the
inadmissible evidence sought to prove.@); Couchman v. State, 3 S.W.3d 155, 160B61 (Tex. App.CFort Worth 1999, pet. ref=d). 
Moreover, in the absence of evidence to the contrary, we presume that
the jury followed the trial court=s instructions to disregard Clark=s testimony.  See Colburn, 966 S.W.2d at 520.  The testimony at issue was not so emotionally
inflammatory that the trial court=s curative instruction did not prevent the jury from being
unfairly prejudiced against Jackson.  See
Bauder, 921 S.W.2d at 698.  Thus, we
hold that the trial court did not abuse its discretion when it denied Jackson=s motion for mistrial, and we
overrule Jackson=s fourth issue.  See Ladd, 3 S.W.3d at 567; Montgomery,
810 S.W.2d at 391.

C.  Objection to Further Hearsay

In his fifth issue, Jackson argues
that the trial court erred by overruling his hearsay objection after Clark
testified that, while Francis was taking a bath, he had told her that Jackson
had shot Witt.  The State argues that the
statement was admissible as an excited utterance and that, alternatively, any
error was harmless.








We need not decide whether this
testimony was admissible as an excited utterance because, even assuming error,
any error was harmless.  Erroneously admitted
evidence is a violation of evidentiary rules and thus non‑constitutional
error.  See King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997). 
We apply rule 44.2(b) and disregard the alleged error if it did not
affect Jackson=s substantial rights.  Tex. R. App. P. 44.2(b); see Mosley v.
State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S.
1070 (1999); Coggeshall v. State, 961 S.W.2d 639, 642B43 (Tex. App.CFort Worth 1998, pet. ref=d). 
In applying the Aharmless error@ test, our primary question is
whether there is a Areasonable possibility@ that the error might have
contributed to the conviction.  Mosley,
983 S.W.2d at 259.

As we noted above, an error in the
admission of a hearsay statement is harmless if other unobjected-to evidence is
admitted at trial that proves the same fact. 
Mayes v. State, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991);
Anderson, 717 S.W.2d at 628; Franks v. State, 90 S.W.3d 771, 805
(Tex. App.CFort Worth 2002, no pet.); Matz v.
State, 21 S.W.3d 911, 912B13 (Tex. App.CFort Worth 2000, pet. ref=d); Couchman, 3 S.W.3d at 160B61. Thus, Francis=s unobjected-to testimony that
Jackson was the shooter and that Francis had told Clark what had happened,
Phillips=s unobjected-to testimony that
Jackson was the shooter, and Hall=s and Amos=s unobjected-to testimony that
Jackson had admitted to being the shooter rendered harmless any error in
admitting Clark=s testimony.  See Tex. R. App. P. 44.2(b); see
Mosley, 983 S.W.2d at 259.  We
overrule Jackson=s fifth issue.

VI.  JURY CHARGE








In his sixth issue, Jackson argues
that the trial court erred by failing to include an accomplice-witness
instruction in the jury charge.  Jackson
acknowledges that his defense counsel did not object to the exclusion of the
accomplice-witness instruction, but he argues that he suffered egregious harm
as a result of the trial court=s error. 

A.  Standard of Review

Appellate review of error in a jury
charge involves a two-step process.  Abdnor
v. State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); see Sakil v. State,
287 S.W.3d 23, 25B26 (Tex. Crim. App. 2009).  Initially, we must determine whether error occurred.  If it did, we must then evaluate whether
sufficient harm resulted from the error to require reversal.  Abdnor, 871 S.W.2d at 731B32.

If there is error in the court=s charge but the appellant did not
preserve it at trial, we must decide whether the error was so egregious and
created such harm that the appellant did not have a fair and impartial trialCin short, that Aegregious harm@ has occurred.  Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1985) (op. on reh=g); see Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon
2006); Allen v. State, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); Hutch
v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).  Egregious harm is the type and level of harm
that affects the very basis of the case, deprives the defendant of a valuable
right, or vitally affects a defensive theory. 
Allen, 253 S.W.3d at 264 & n.15; Olivas v. State, 202
S.W.3d 137, 144, 149 (Tex. Crim. App. 2006); Almanza, 686 S.W.2d at 172.








In making an egregious harm
determination, Athe actual degree of harm must be
assayed in light of the entire jury charge, the state of the evidence,
including the contested issues and weight of probative evidence, the argument
of counsel and any other relevant information revealed by the record of the
trial as a whole.@ 
Almanza, 686 S.W.2d at 171; see generally Hutch, 922
S.W.2d at 172B74. 
The purpose of this review is to illuminate the actual, not just
theoretical, harm to the accused.  Almanza,
686 S.W.2d at 174.  Egregious harm is a
difficult standard to prove and must be determined on a case-by-case
basis.  Ellison v. State, 86
S.W.3d 226, 227 (Tex. Crim. App. 2002); Hutch, 922 S.W.2d at 171.

B.  Accomplice-Witness Instruction

Article 38.14 of the code of criminal
of procedure provides, AA conviction cannot be had upon the
testimony of an accomplice unless corroborated by other evidence tending to
connect the defendant with the offense committed; and the corroboration is not
sufficient if it merely shows the commission of the offense.@ 
Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).  A prosecution witness Awho is indicted for a lesser included
offense based upon alleged participation in commission of the greater offense
is also an accomplice as a matter of law.@  Ex parte Zepeda,
819 S.W.2d 874, 876 (Tex. Crim. App. 1991). 
If a prosecution witness is an accomplice as a matter of law, the trial
court is under a duty to instruct the jury accordingly, and failure to do so is
error.  Herron v. State, 86 S.W.3d
621, 631 (Tex. Crim. App. 2002).








The instruction does not require the
jury to be skeptical of accomplice-witness testimony or to give less weight to
such testimony than to other evidence.  Id.  The instruction merely informs the jury that
it cannot use the accomplice-witness testimony unless some non‑accomplice
evidence connects the defendant to the offense. 
Id.

The test for sufficient corroboration
is whether, after excluding the accomplice=s testimony, other evidence of an incriminating character
tends to connect the defendant with the commission of the offense.  Burks v. State, 876 S.W.2d 877, 887
(Tex. Crim. App. 1994), cert. denied, 513 U.S. 1114 (1995); Munoz v.
State, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). Corroborating evidence
need not directly connect the defendant to the crime or be sufficient by itself
to establish guilt; instead, the combined weight of the corroborating evidence
need only tend to connect the defendant to the offense. Cathey v. State,
992 S.W.2d 460, 462 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082
(2000); McDuff v. State, 939 S.W.2d 607, 613 (Tex. Crim. App.), cert.
denied, 522 U.S. 844 (1997). 
Additionally, the corroborative evidence may be circumstantial or
direct, and the accomplice testimony need not be corroborated on every element
of the offense.  Brosky v. State,
915 S.W.2d 120, 138 (Tex. App.CFort Worth, pet. ref=d), cert. denied, 519 U.S.
1020 (1996).








Non‑accomplice evidence can
render harmless a failure to submit an accomplice-witness instruction by
fulfilling the purpose an accomplice-witness instruction is designed to
serve.  Herron, 86 S.W.3d at
632.  The omission of an
accomplice-witness instruction is generally harmless under the egregious harm
standard unless the corroborating non‑accomplice evidence is A>so unconvincing in fact as to render
the State=s overall case for conviction clearly
and significantly less persuasive.=@  Id. (quoting Saunders
v. State, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).

C.  No Egregious Harm

Here, Jackson was indicted for and
convicted of capital murder for killing Witt in the course of committing or
attempting to commit robbery.  See Tex.
Penal Code Ann. ' 19.03(a)(2) (Vernon Supp.
2009).  Francis testified that he had
been charged with consipiracy to commit robbery for his participation in this
crime, and Phillips testified that he had been charged with capital murder for
his participation in the crime; consequently, they were accomplices as a matter
of law, and the trial court erred by not including the accomplice-witness
instruction in the jury charge.  See
Zepeda, 819 S.W.2d at 876.  We must
consider whether Jackson suffered egregious harm as a result of this
error.  See Herron, 86 S.W.3d at
631.








The non-accomplice evidence in this
case consisted of (1) Hall=s testimony that he had overheard
Jackson telling a neighbor that he hoped Phillips could Ahold water@ and would not Asnitch@ on him and saying that he should have Amurked@ Phillips; (2) Coleman=s testimony that Phillips had told him about the robbery and
that Jackson was the shooter; (3) Amos=s testimony that both Phillips and Jackson had told him that
Jackson was the shooter; (4) Clark=s testimony that she had heard Phillips tell Francis that he
and Jackson saw a lot of drugs and money at Witt=s house and wanted to rob Witt and that Francis had told her
about the robbery and that Jackson shot Witt during the robbery; and (5) Porter=s and Witt=s cousin=s testimony that they had seen
Jackson at the crime scene after Witt=s murder, contradicting the testimony of Jackson=s alibi witnesses.

Jackson argues that Clark=s and Coleman=s only knowledge of Jackson=s involvement in the crime came from
his accomplices, Phillips and Francis. Jackson admits that Hall and Amos
offered corroborating testimony, but he argues that they are Aindividuals of questionable veracity@ and that Jackson=s alleged admissions to Hall and Amos
were ambiguous.

Nevertheless, we cannot say that the
corroborating (non‑accomplice) evidence was not Aso unconvincing in fact as to render
the State=s overall case for conviction clearly
and significantly less persuasive.@  Herron, 86
S.W.3d at 632 (quoting Saunders, 817 S.W.2d at 692).  The non‑accomplice evidence need not
prove all the elements of the alleged offense or directly link Jackson to the
commission of the offense; rather, it is sufficient if it tends to connect him
to the offense.  See Cathey, 992
S.W.2d at 462; Brosky, 915 S.W.2d at 138.  After excluding the accomplice testimony, we
find that the combined weight of the corroborating evidenceCeven absent Clark=s and Coleman=s testimonyCsufficiently tends to connect Jackson
to the robbery and Witt=s murder.  See Cathey, 992 S.W.2d at 462; Brosky,
915 S.W.2d at 138.








Accordingly, we hold that the trial
court=s error in failing to include an
accomplice-witness instruction in the jury charge did not result in egregious
harm to Jackson such that he did not have a fair and impartial trial.  See Tex. Code Crim. Proc. Ann. art. 36.19;
Allen, 253 S.W.3d at 264; Hutch, 922 S.W.2d at 171; Almanza,
686 S.W.2d at 171.  We overrule Jackson=s sixth issue.

VII.  CONCLUSION

Having overruled Jackson=s six issues, we affirm the trial
court=s judgment.

 

PER CURIAM

 

PANEL: WALKER, LIVINGSTON, and
GARDNER, JJ.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: April 15, 2010











[1]See Tex. R.
App. P. 47.4.





[2]There is some dispute in the record about whether a
fourth veniremember, who ultimately sat on the jury, was Hispanic or
African-American.





[3]The State noted its belief that one of Jackson=s
defense theories at trial would be his isolation from the Como community.





[4]Jackson=s attorney explained during oral argument that he was
not challenging the State=s reasons for striking veniremembers 4 and 14, but he
included in his brief an analysis of the State=s stated reasoning for striking them to show
discriminatory intent in striking veniremember 3.





[5]Jackson appears to argue that veniremember 21 raised
her hand when the State asked the entire panel if anyone disagreed with the law
of parties, but the record shows only that veniremembers 3, 13, 46, and 60
raised their hands.  Veniremembers 46 and
60 were not within the strike zone and did not sit on the jury.  The only other veniremember who expressed disagreement
with the law of parties and who was within the strike zone was questioned
extensively on his opinion, ultimately agreed that he could follow the law, but
did not sit on the jury for reasons not revealed by the record. 





[6]When the trial court asked if defense counsel had any
comment to the State=s proffered reasons, defense counsel responded only
that he was concerned with the State=s reasoning for veniremember 4.





[7]Jackson emphasizes the State=s use of
the word AI,@ but A[w]hat determines the impermissibility of a reference
to the defendant=s failure to testify is not the use of >I= or >he= or >she= or any
other word, but rather the entirety of the prosecutor=s
statements, taken in the context in which the words were used and heard by the
jury.@  Cruz v.
State, 225 S.W.3d 546, 549 (Tex. Crim. App. 2007); but see Cherry v.
State, 507 S.W.2d 549, 550 (Tex. Crim. App. 1974) (A[W]hen
the word >I= is used in reference to something the defendant might
have testified to, but did not, it is illogical to think that the jury is not
reminded of the defendant=s failure to testify.@).